UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-04961-RGK (MANx) | Date | March 5, 2015 |
|---|---|---|---|
| Title | *PARENTEAU, et al. v. GENERAL MOTORS, LLC* | | |

| Present: The Honorable | R. GARY KLAUSNER, U.S. DISTRICT JUDGE | |
|---|---|---|
| Sharon L. Williams (Not Present) | Not Reported | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:** (IN CHAMBERS) Order re: Defendant's Motion to Dismiss First Amended Complaint (DE 22)

## I. INTRODUCTION

On October 13, 2014, plaintiffs William Parenteau, David Olmedo, and Wendy Smith (collectively, "Plaintiffs") filed a First Amended Class Action Complaint ("FAC") against General Motors, LLC ("GM" or "Defendant"). The FAC contains six claims arising from an alleged defect in certain GM vehicles, which purportedly causes excessive oil consumption and related issues. Those claims are as follows: (1) Violation of California's Consumer Legal Remedies Act ("CLRA"), California Civil Code §§ 1750, *et seq.*; (2) Violation of California Business & Professions Code §§ 17200, *et seq.* ("Unfair Competition Law" or "UCL"); (3) Fraud by Omission; (4) Breach of Written Warranty under the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*; (5) Breach of Express Warranty under California Commercial Code § 2313; and (6) Breach of Implied Warranty pursuant to the Song-Beverly Consumer Warranty Act, California Civil Code §§ 1792 and 1791.1, *et seq.*

On November 3, 2014, Defendant filed the present Motion to Dismiss (the "Motion"). For the following reasons, the Court **GRANTS in part** and **DENIES in part** Defendant's Motion.

## II. FACTUAL BACKGROUND

The following facts are taken from the FAC:

Plaintiffs each purchased a 2010 or 2011 model year GM vehicle equipped with a 2.4 Liter engine from a dealer in California. Mr. Parenteau purchased a new 2011 Chevrolet Equinox LT, Mr. Olmedo purchased a new 2011 GMC Terrain, and Ms. Smith purchased a Certified Pre-Owned 2010

Chevrolet Equinox. Plaintiffs allege that their vehicles, as well as all 2010 – 2013 GM vehicles equipped with a 2.4L engine (the "Class Vehicles"), contain "one or more design and/or manufacturing defects in their engines that cause[ ] them to be unable to properly utilize engine oil and, in fact, to improperly burn off and/or consume abnormally high amounts of oil . . . ." (FAC ¶ 3.)

The engine oil at issue is used to lubricate the pistons within the vehicles' combustion engines, as well as the walls of the cylinder bores in which the pistons are located. The pistons are pushed back and forth in their cylinder bores during the combustion process, and the engine oil is necessary to reduce wear on moving parts, improve sealing, and cool the engine by carrying heat away from the moving parts. Additionally, the pistons are made gas-tight by piston rings. These rings seal the combustion chamber from any leakage during the combustion process by transferring heat to the cylinder wall and controlling oil consumption.

Plaintiffs appear to allege, based on Defendant's own identification of the defect, that the coating on the piston rings wears out too quickly, which allows engine oil to pass between the piston rings and the surface of the cylinder wall and enter the combustion chamber. As a result, oil is improperly burned off during combustion, thus reducing the amount of oil contained in the engine. When engine oil is insufficient, the engine does not have the necessary lubrication or cooling, thereby causing premature wear of internal parts, inadequate performance, and/or catastrophic engine failure. Additionally, engine oil in the combustion chamber can cause carbon deposits to form within the engine, which can lead to damage of the vehicle ignition and emission components, fouling of the spark plugs or fuel injectors, damage to the engine valves, fouling of exhaust emission control sensors, clogging of the catalytic converter, and catastrophic engine failure.

Plaintiff alleges that the defect is unreasonably dangerous to consumers because engine failure can occur "while the Class Vehicles are in operation at any time and under any driving speed, thereby exposing the Class Vehicle drivers, their passengers, and others who share the road with them to serious risk of accident and injury." (FAC ¶ 6.) Additionally, the consumption of abnormally high amounts of oil has required Plaintiffs to add oil to their vehicles and pay for unreasonably frequent oil changes after very short driving distances. Plaintiffs began experiencing the effects of the defect in mid- to late 2013, while express warranties covering repairs to their vehicles were in effect.

Defendant has known of the defect since 2010, if not earlier. In July 2012, as the number of customer complaints about the defect increased, Defendant published an article in GM Tech Link, a monthly publication for GM dealership service technicians, entitled "Excessive Oil Consumption." The article informed technicians that "[e]xcessive oil consumption may be noted on some 2010 Equinox and Terrain models equipped with the 2.4L engines." (FAC ¶ 38.) The article stated that "this condition may not be evident until the vehicle has accumulated 20,000 miles or more." (*Id.*) It also stated that the vehicles' engines may need to be replaced if certain "zebra stripes" were present on the cylinder walls.

In February 2013, rather than disclose the defect, Defendant sent "customer satisfaction" letters to all Class Vehicle owners informing them that Defendant had recently introduced into production a software update for the vehicles' oil life monitoring systems that would recommend more frequent oil changes "to support engine durability and overall operating costs." (FAC ¶ 39.) Defendant stated that it would update the Class Vehicles with these improvements at no charge. Plaintiffs allege that this conduct was an attempt to delay the onset of costly engine repairs that are substantially certain to occur as a result of the defect until after the expiration of the Class Vehicles' express warranties.

In August 2013, Defendant published another GM Tech Link article regarding the defect. This article stated that the excessive oil consumption did not require engine replacement. Instead, it directed that "[i]f excessive oil consumption is confirmed after an oil consumption test, new piston[s] and rings should be installed." (FAC ¶ 42.) In describing the problem, under a section titled "Piston Ring

Coating," the article stated that "the top compression ring in the new kit has a more robust coating on it that is designed not to wear as quickly as the original coating. Tests indicate that it wears about 4-5 times longer than the original coating." (*Id.* at ¶ 43.) Plaintiffs interpret this as meaning that "the original piston ring coating was wearing 4-5 times faster than it ought to." (*Id.* at ¶ 43 n.9.) Finally, the article explained that "[t]he pistons must [also] be replaced because as the ring wears down, it starts to widen the piston ring grooves. The worn grooves will not retain the new rings correctly." (*Id.* at ¶ 43.) Defendant published a similar Tech Link article the following month as well. (FAC, Ex. 1.)

Prior to purchasing or leasing the Class Vehicles, Plaintiffs and other owners and lessees did not know that the vehicles suffered from the defect at issue, and reasonably expected that the vehicles would not experience the defect during foreseeable and normal usage. Had Plaintiffs and the other owners and lessees known about the defect at the time of sale or lease, as well as the associated costs and safety hazards described above, they would not have purchased the Class Vehicles, or would have paid less for them.

Plaintiffs bring the current action on behalf of themselves as well as a nationwide class defined as follows:

> All current and former owners or lessees in the United States who at any time purchased or leased any 2010-2013 GM vehicles equipped with 2.4 Liter engines, including but not limited to any 2010-2013 Buick LaCrosse, 2011-2013 Buick Regal, 2012-2013 Buick Verano, 2010-2013 Chevrolet Equinox, 2012-2013 Chevrolet Captiva, 2012-2013 Chevrolet Orlando, or 2010-2013 GMC Terrain vehicle.

(FAC ¶ 104.) They also bring it on behalf of a sub-class of the above owners or lessees who purchased or leased their vehicles in California. (*Id.*)

## III.  JUDICIAL STANDARD

The federal pleading standard states in relevant part that "a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under Federal Rule of Civil Procedure ("Rule") 12(b)(6), a party may move to dismiss for failure to state a claim upon which relief can be granted. In deciding a Rule 12(b)(6) motion, the court must assume allegations in the challenged complaint are true, and construe the complaint in the light most favorable to the non-moving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996). However, a court need not accept as true unreasonable inferences, unwarranted deductions of fact, or conclusory legal allegations cast in the form of factual allegations. *See W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981). Furthermore, a pleading must contain sufficient factual matter that, if accepted as true, states a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is facially plausible when there are sufficient factual allegations to draw a reasonable inference that the defendant is liable for the misconduct alleged. *Id.*

## IV.  DISCUSSION

Defendant argues that Plaintiffs' allegations in support of each of their six claims are insufficient under Rule 12(b)(6) for a variety of reasons. The Court addresses the claims in turn.

### A.  Violation of the CLRA and UCL, and Fraud by Omission

Plaintiffs' first three claims, for violation of the CLRA and UCL and for common law "fraud by omission," are all premised on the allegation that Defendant concealed and failed to disclose the defective nature of the Class Vehicles. (*See* FAC ¶¶ 115, 118-119, 129-132, 140-141.)

Concealment is actionable where it entails "the suppression of a fact by one who is bound to disclose it, or the suppression of a fact that is contrary to a representation that was made." *Collins v. eMachines, Inc.*, 202 Cal. App. 4th 249, 255 (2011).[1] Plaintiffs' claims allege the first of these two circumstances. As relevant here, a defendant is "bound to disclose" a fact (1) "when the defendant has exclusive knowledge of material facts not known or reasonably accessible to the plaintiff[,]" or (2) "when the defendant actively conceals a material fact from the plaintiff[.]" *Id.* "[A] fact is deemed 'material[ ]' . . . if a 'reasonable consumer' would deem it important in determining how to act in the transaction at issue." *Id.* at 256.

Defendant argues that Plaintiffs' claims are insufficient for four reasons: (1) Plaintiffs do not sufficiently identify the alleged defect; (2) Plaintiffs fail to sufficiently allege a defect that is "material"; (3) Plaintiffs fail to allege that Defendant knew of any material defect at the time it sold Plaintiffs' vehicles; and (4) Plaintiff Smith does not sufficiently allege the circumstances of Defendant's nondisclosure or "omission" with particularity, as required by Rule 9(b). The Court will address each argument in turn.

       1.     *Identification of the Defect*

Defendant devotes only one sentence to its first argument, in which it asserts that the FAC "does not identify any allegedly defective component . . . ." (Def.'s Mot. 14:11-13.) The Court disagrees. The FAC devotes at least four paragraphs to explaining the interaction between engine oil and the component engine parts at issue. (*See* FAC ¶¶ 4, 33-35.) Plaintiffs then recite Defendant's own alleged description of the defect, as set forth in the August 2013 Tech Link article. That description indicates that the coating on the piston rings wears down, which in turn allows engine oil to pass between the piston rings and the surface of the cylinder wall and enter the combustion chamber. The oil is then improperly burned off during combustion, and can also cause carbon deposits to form in the engine. These allegations are sufficient at the pleading stage. *See Asghari v. Volkswagen Grp. of Am.*, 13-02529-MMM, 2013 WL 9885046, at *1, 14 (C.D. Cal. Nov. 4, 2013) (finding that allegations that "the engine is unable to utilize oil properly" and "the engine improperly burns off and consumes 'abnormally high amounts of oil'" were sufficient).

       2.     *Materiality of the Defect*

In addressing a defect that manifested after the expiration of an express warranty, the Ninth Circuit held that for an omission to be material, the defect must "pose safety concerns." *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1142 (9th Cir. 2012). The parties dispute whether materiality is limited to safety concerns where the defect manifests itself during the warranty period. However, the Court need not address this issue, as it finds that Plaintiffs have alleged a defect which poses safety concerns.

Plaintiffs allege that the defect causes a reduction in engine oil to an insufficient level, and can also cause carbon deposits to form within the engine. Both of these effects can lead to catastrophic engine failure. Plaintiff then alleges that the defect is unreasonably dangerous because engine failure can occur "while the Class Vehicles are in operation at any time and under any driving speed, thereby exposing the Class Vehicle drivers, their passengers, and others who share the road with them to serious risk of accident and injury." (FAC ¶ 6.) These allegations are nearly identical to those found to allege a safety issue in *Asghari*. *See* 2013 WL 9885046, at *15-16 (holding that allegations "pertained to a safety issue" where "[p]laintiffs allege[d] that the engine's inability to utilize engine oil properly can cause

---

[1]This same rule applies to all three claims. *See id.* at 255 (CLRA), 258 (UCL), 259 (common law fraud).

engine failure to occur at any time, under any driving condition, and at any speed, creating a serious risk of injury."); *see also Price v. Kawasaki Motors Corp., USA*, 10-01074-JVS, 2011 WL 10948588, at *6 (C.D. Cal. Jan. 24, 2011) ("Here, [plaintiff] alleges that due to the Defect, a safety problem then arises: without adequate oil, the engine or transmission may seize, causing accident or injury. . . . Given the safety risk, the Court finds that an omission about the Defect would affect a reasonable consumer's willingness to purchase a KMC motorcycle.").

Defendant cites *Eisen v. Porsche Cars North America, Inc.*, in which the court identified the risk posed by the defect as "getting stranded on the roadside," and held that this did "not amount to a safety concern . . . ." 11-9405-CAS, 2012 WL 841019, at *5 (C.D. Cal. Feb. 22, 2012). However, the risk here is that of being rendered immobile on a busy street or highway and involved in a collision. As the cases just cited illustrate, district courts in the Ninth Circuit have routinely recognized this as a safety risk. *See Asghari*, 2013 WL 9885046, at *15-16; *Cholakyan v. Mercedes-Benz USA, LLC*, 796 F. Supp. 2d 1220, 1236-38 (C.D. Cal. 2011) (finding safety risk posed by alleged water leak defect which could cause engine failure "at any time and under any driving condition or speed, thereby contributing to traffic accidents").[2]

Defendant next argues that "from all that appears on the face of plaintiff's complaint, **no one** has **ever** experienced or reported to [the National Highway Traffic Safety Administration] an actual accident or personal injury alleged to have been caused by excessive oil consumption." (Def.'s Reply 3:18-20 (emphasis in original).) However, the case law does not require anyone to have actually been injured before an omission regarding an alleged safety defect can be held material and actionable. *See Ho v. Toyota Motor Corp.*, 931 F. Supp. 2d 987, 997 (N.D. Cal. 2013). Rather, as stated in *Wilson*, the defect must "pose safety concerns." 668 F.3d at 1142; *see Daugherty v. Am. Honda Motor Co., Inc.*, 144 Cal. App. 4th 824, 836 (2006) (the complaint must allege "an[ ] instance of physical injury *or . . . safety concerns* posed by the defect") (emphasis added).

Because Plaintiffs have plausibly alleged that the defect poses safety concerns, they have sufficiently alleged that the defect is "material."

### 3. *Defendant's Knowledge of the Defect*

Defendant argues that Plaintiffs fail to allege Defendant knew of any defect which posed safety concerns at the time Mr. Parenteau and Mr. Olmedo purchased their vehicles, or at the time GM delivered Ms. Smith's pre-owned model year 2010 Equinox to a GM dealer for sale to a prior owner. Mr. Parenteau purchased his vehicle on October 26, 2010, Mr. Olmedo purchased his on August 13, 2011, and Ms. Smith purchased her vehicle on July 13, 2013. While Ms. Smith does not allege the date her vehicle was originally sold, Defendant asserts that its shipping of 2010 model year vehicles to

---

[2] Defendant argues that the holding in *Cholakyan* conflicts with the Ninth Circuit's discussion in *Wilson* of the required causal nexus between the alleged defect and alleged safety hazard. Yet *Wilson* expressly distinguished *Cholakyan*, thus showing that the two cases are not in conflict. In *Wilson*, the court found that the complaint "did not plead any facts indicating how the alleged design defect, *i.e.*, the loss of the connection between the power jack and the motherboard, causes the Laptops to burst into flames . . . ." 668 F.3d at 1145. Such causation was implausible, since "it is difficult to conceive . . . how the Laptops could ignite if they are 'unable to receive an electrical charge.'" *Id.* at 1144. The court distinguished the case before it "from those cases surviving a motion to dismiss where the alleged design defect could conceivably lead to a safety hazard," *id.* at 1145, and the first case to which it cited was *Cholakyan*. *Id.* The defect alleged in the present case could conceivably lead to a safety hazard for the same reasons as the defect in *Cholakyan*.

authorized dealers occurred from "approximately September 2009 to August 2010." (Def.'s Mot. 18 n.2.) Plaintiffs must allege Defendant's knowledge of the defect to prevail on their claims. *See Wilson*, 668 F.3d at 1145-46. While circumstances constituting fraud must be alleged with particularity, knowledge may be alleged generally. Fed. R. Civ. P. 9(b).

Plaintiffs allege that "Defendant acquired knowledge of the oil consumption engine defect since 2010, if not before, through sources not available to Class Members, including but not limited to pre-production testing, pre-production and post-production failure mode and analysis data, early consumer complaints made exclusively to GM's network of dealers who relayed those complaints to GM, as well as consumer complaints made directly to GM itself, aggregate warranty data compiled by GM from GM's network of dealers, testing conducted by GM in response to consumer complaints, repair order information and parts data received by GM from GM's network of dealers, and from other internal sources." (FAC ¶ 37.) Plaintiffs further allege that Defendant notified its dealership service technicians of the defect via a Tech Link article as early as July 2012, and followed this up with "customer satisfaction letters" and two additional Tech Link articles in February, August, and September 2013, respectively.

Defendant cites to *Wilson* for the proposition that Plaintiffs' allegations of knowledge are conclusory and insufficient. In *Wilson*, the court held the allegation that the manufacturer "had 'access to the aggregate information and data regarding the risk of overheating'" was "speculative and [did] not suggest how any tests or information could have alerted [the manufacturer] to the defect." 668 F.3d at 1147. However, in *Falco v. Nissan North America*, a court in the Central District distinguished *Wilson* where the plaintiff's allegations of knowledge due to internal testing and reporting, which were nearly identical to the instant allegations, were accompanied by allegations that the manufacturer issued Technical Service Bulletins regarding the defect at issue to dealerships approximately one-and-a-half to two-and-a-half years after the plaintiffs purchased their vehicles. 13-00686-DDP, 2013 WL 5575065, at *6 (C.D. Cal. Oct. 10, 2013). The court found that the additional allegations permitted the plausible inference that the manufacturer was aware of the defect at the time it sold the vehicles, and "acquired this knowledge through the sorts of internal data Plaintiffs allege." *Id.*

Similarly, here, the Court finds that the allegations regarding Defendant's Tech Link articles and customer satisfaction letters are sufficient to render Plaintiffs' allegations plausible rather than conclusory. Contrary to the allegations in *Wilson*, Plaintiffs' allegations show not only that testing and internal reporting could have alerted Defendant to the defect, but that they in fact did so. Moreover, the July 2012 article was published sufficiently close in time to the purchase of the vehicles so as to permit a reasonable inference that Defendant was aware of the defect at the time of purchase.[3] *See also Ho v. Toyota Motor Corp.*, 931 F. Supp. 2d 987, 998 (N.D. Cal. 2013) (finding similar allegations of internal testing and reporting sufficient where coupled with allegation that manufacturer issued two technical service bulletins regarding the defect).

The FAC also includes the text of forty complaints filed by consumers with the National Highway Traffic Safety Administration and posted on the Internet. (FAC ¶ 50.) However, these complaints are undated, and therefore do not aid in showing whether Defendant had knowledge of the defect at the time the vehicles were sold. *See Wilson*, 668 F.3d at 1147 ("[C]ourts have rejected undated

---

[3]The plaintiffs in *Falco* also alleged that around the time the bulletins were issued, or shortly before, the manufacturer replaced the defective part with a redesigned version. 2013 WL 5575065, at *6. This is insufficient to distinguish *Falco* from the present case, especially given that the July 2012 Tech Link article informed technicians that customers' engines may need to be replaced, and the February 2013 customer service letters notified customers of a software update to the oil life monitoring system.

customer complaints offered as a factual basis for a manufacturer's knowledge of a defect because they provide no indication whether the manufacturer was aware of the defect *at the time of sale*.") (emphasis in original).[4]

        4. *Whether Plaintiff Smith alleges the circumstances of Defendant's nondisclosure with particularity*

Defendant asserts that Ms. Smith "does not allege any contact with GM prior to purchase that would have provided an occasion for GM to disclose its claimed knowledge of the defect to her."[5] (Def.'s Reply 9:24-26.) In *Kearns v. Ford Motor Co.*, 567 F.3d 1120 (9th Cir. 2008), the Ninth Circuit held that claims for fraudulent nondisclosure "must be pleaded with particularity under Rule 9(b)." *Id.* at 1127. In *Marolda v. Symantec Corp.*, 672 F. Supp. 2d 992 (N.D. Cal. 2009), the court found that following *Kearns*, "to plead the circumstances of omission with specificity, plaintiff must describe the content of the omission and where the omitted information should or could have been revealed, as well as provide representative samples of advertisements, offers, or other representations that plaintiff relied on to make her purchase and that failed to include the allegedly omitted information." *Id.* at 1002; *see also Eisen*, 2012 WL 841019, at *3 (quoting *Marolda*).

As Defendant points out, Ms. Smith does not allege any contact with Defendant (as distinct from the dealer) prior to purchasing her vehicle where omissions regarding the defect at issue should or could have been revealed. Nor does she allege with any degree of specificity which advertisements, offers, or other representations she relied on that failed to include the omitted information. While she alleges vaguely that she "was exposed to various types of information" (FAC ¶ 88), this does not satisfy the heightened pleading requirement of Rule 9(b).

Plaintiffs interpret Defendant's argument as pertaining to a deficiency in the allegations of reliance upon Defendant's omissions. (*See* Pls.' Objection to Def.'s Reply Br., ECF No. 28 at 2:11-14.) However, the above particularity requirement pertains first and foremost to allegations about the omissions themselves. One of the cases to which Plaintiffs cite makes this clear. In *Herremans v. BMW of North America, LLC*, before addressing the issue of reliance, the court first analyzed whether the plaintiff alleged a fraudulent omission or concealment with particularity. 14-02363-MMM, 2014 WL 5017843, at *9-10 (C.D. Cal. Oct. 3, 2014). *That* is the issue which Defendant appears to raise. The court in *Herreman* found that the plaintiff satisfied the "how" of the "who, what, why, and how" particularity analysis in part because the plaintiff alleged that BMW made certain assurances to her and the other class members. *Id.* at 10. Ms. Smith does not allege that she viewed or received a similar communication from Defendant.

For the foregoing reasons, the Court **GRANTS** Defendant's Motion to Dismiss Plaintiffs' first three claims as to Plaintiff Smith, **with leave to amend**. In all other respects, Defendant's Motion to Dismiss Plaintiffs' first three claims is **DENIED**.

    **B.**     <u>**Claims for Breach of Express Warranty**</u>

---

[4]Since the Court finds that Plaintiffs sufficiently allege Defendant's knowledge apart from these allegations regarding customer complaints, the Court need not decide whether to take judicial notice of the dates these complaints were filed and posted, as Defendant requests.

[5]Plaintiffs assert that Defendant raised this argument for the first time in its Reply. However, Defendant raised this argument in footnote 2 of the Motion, which the Court finds sufficient.

To state a claim for breach of express warranty under California Commercial Code § 2313, which forms the basis for Plaintiffs' fifth claim, "a plaintiff must show that the seller: (1) made an affirmation of fact or promise or provided a description of its goods; (2) the promise or description formed part of the basis of the bargain; (3) the express warranty was breached; and (4) the breach caused injury to the plaintiff." *Rodarte v. Philip Morris, Inc.*, 03-0353-FMC, 2003 WL 23341208, at *5 (C.D. Cal. June 23, 2003) (citing Cal. Com. Code § 2313(1)(a); *Williams v. Beechnut Nutrition Corp.*, 185 Cal. App. 3d 135, 142 (1986)).

Plaintiff's fourth claim is also for breach of express warranty, though under a different statute - the Magnuson-Moss Warranty–Federal Trade Commission Improvement Act ("Magnuson-Moss Act"). The Magnuson-Moss Act authorizes a civil suit by a consumer to enforce the terms of an implied or express warranty. *See* 15 U.S.C. § 2310(d); *Daugherty*, 144 Cal. App. 4th at 832-33. "Magnuson-Moss 'calls for the application of state written and implied warranty law, not the creation of additional federal law,' except in specific circumstances in which it expressly prescribes a regulating rule." *Daugherty*, 144 Cal. App. 4th at 833 (quoting *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1012 (D.C. Cir. 1986)). Thus, "this court's disposition of the state law [express] warranty claim[ ] determines the disposition of the Magnuson-Moss Act claim[ ]." *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008).

Plaintiffs allege that Defendant breached both its 3-year/36,000-mile New Vehicle Limited Warranty and its 5-year/100,000-mile Powertrain Component Warranty. Both warranties state that they "cover[ ] repairs to correct any vehicle defect related to materials or workmanship occurring during the warranty period." (FAC at p. 54 n. 15-16; Oxford Decl., Ex. B at 4.)[6] The warranties further instruct that "[t]o obtain warranty repairs, take the vehicle to a . . . dealer facility within the warranty period and request the needed repairs." (Oxford Decl., Ex. B at 4.)

Defendant argues that Plaintiffs have failed to plead a claim for breach of express warranty because "they have not pleaded any factual matter showing (1) that the claimed defect actually has damaged their vehicles so that they are in need of repair or (2) that they actually requested GM dealers to perform repairs." (Def.'s Mot. 20:22-26.)

With regard to Defendant's first contention, the language of the warranty simply states that Defendant would cover repairs "to correct any vehicle defect"; it does not state that any such defect must actually cause physical damage to the vehicle. As discussed above, Plaintiffs have sufficiently alleged the existence of a defect.

With regard to Defendant's second contention, Plaintiffs allege that they took their vehicles to GM dealers and complained that the vehicles were consuming excessive amounts of oil. Defendant provides no support for its assertion that to invoke its obligation to repair to the alleged defect, Plaintiffs were required to know precisely which repairs needed to be made, and to communicate that information to the dealer. Such an interpretation would be particularly unreasonable here, where Plaintiffs allege that Defendants only made documents describing the defect available to the dealers, and concealed them from consumers.

---

[6]The Court takes judicial notice of the New Vehicle Limited Warranty for the 2011 Chevrolet Equinox attached to Mr. Oxford's declaration, since Plaintiffs' claim depends on the contents of that document, Defendant attached the document to its Motion, and Plaintiffs do not dispute the document's authenticity. *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005). Mr. Oxford states that this warranty is "substantively identical" to that for Mr. Olmedo's 2011 GMC Terrain and Ms. Smith's 2010 Chevrolet Equinox (Oxford Decl. ¶ 4), and Plaintiffs do not dispute that assertion.

Defendant also argues that a warranty offering the exclusive remedy of repair or replacement for a "defect in materials or workmanship" does not cover design defects. Defendant notes that Plaintiffs do not specify whether the defect is a manufacturing or design defect, but instead allege that the vehicles contain "one or more design *and/or* manufacturing defects . . . ." (*See, e.g.*, FAC ¶ 3 (emphasis added).) Further, Defendant asserts that Plaintiffs only allege facts showing a manufacturing defect.

Defendant is correct that district courts in the Ninth Circuit typically hold that the type of warranty at issue does not cover design defects. In 2010, Judge Selna of the Central District of California engaged in a detailed analysis of this issue, and explained as follows:

> In *McCabe* [*v. American Honda Motor Co.*, 100 Cal. App. 4th 1111, 1119-20 (2002)], [ ] the California Court of Appeal distinguished between a design defect and "manufacturing defects": "California recognizes two distinct categories of product defects . . . . A manufacturing defect exists when an item is produced in a substandard condition . . . . Such a defect is often demonstrated by showing the product performed differently from other ostensibly identical units of the same product line . . . . A design defect, in contrast, exists when the product is built in accordance with its intended specifications, but the design itself is inherently defective." . . . The Court agrees . . . that an express written warranty covering 'materials and workmanship' does not include design defects. As articulated by the *McCabe* court, defects in design are of a wholly different character than those occurring in the manufacturing process, whether because the materials used were defective or because materials were assembled in a shoddy or otherwise improper manner.

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, and Prods. Liability Litig.*, 754 F. Supp. 2d 1145, 1180-81 (C.D. Cal. 2010); *see also Lee v. Toyota Motor Sales, U.S.A., Inc.*, 992 F. Supp. 2d 962, 978-79 (C.D. Cal. 2014).

Additionally, given the above distinction drawn by the California Court of Appeal, Plaintiffs' allegations may well pertain to a design, rather than a manufacturing, defect. However, Defendant's September 2013 Tech Link article expressly contemplated that repairing the defect, including conducting the oil consumption test and replacing pistons and related components, may be covered "under warranty" (*see* FAC, Ex. 1 at 5), and Defendant does not assert that this article referred to a warranty other than the one at issue. This indicates that Defendant itself viewed the defect as a manufacturing defect. In light of this, the Court finds that Plaintiffs' allegations are sufficient at the pleading stage.

For the foregoing reasons, the Court **DENIES** Defendant's Motion to Dismiss as to Plaintiffs' fourth and fifth claims.

### C. Claim for Breach of Implied Warranty of Merchantability

In California, an implied warranty of merchantability arises under the Song-Beverly Consumer Warranty Act. Pursuant to California Civil Code § 1791.1(a)(2), goods must be "fit for the ordinary purposes for which such goods are used." This warranty "does not impose a general requirement that goods precisely fulfill the expectation of the buyer. Instead, it provides for a minimum level of quality." *Am. Suzuki Motor Corp. v. Superior Court*, 37 Cal. App. 4th 1291, 1296 (1995) (internal quotation marks omitted). As applied to vehicles, the implied warranty requires that they be "in safe condition and substantially free of defects." *See Isip v. Mercedes-Benz USA, LLC*, 155 Cal. App. 4th 19, 27 (2007).

Defendant contends that the alleged defect is insufficient to give rise to a breach of the implied

warranty of merchantability. The Court disagrees. Plaintiffs have plausibly alleged that the defect can cause catastrophic engine failure while a vehicle is in operation, at any time and at any speed. Assuming for present purposes that the allegations in the Complaint are true, the Class Vehicles are not "in safe condition and substantially free of defects." *See Asghari*, 2013 WL 9885046, at *24 (finding nearly identical allegations sufficient where they were paired with consumer complaints about suddenly losing power)[7]; *Falco*, 2013 WL 5575065, at *9 (finding allegations sufficient to survive motion to dismiss where, as a result of the defect, "a vehicle . . . whines, buzzes, fails to accelerate and maintain speed, experience[s] engine failure, and ultimately requires engine repairs").

Defendant also argues that Plaintiffs' claim fails because the defect did not manifest itself during the "durations" of their implied warranties. Section 1791.1(c) provides that the implied warranty "shall be coextensive in duration with an express warranty which accompanies the consumer goods," but "in no event shall such implied warranty have a duration of . . . more than one year following the sale of new consumer goods to a retail buyer." Cal. Civ. Code § 1791.1(c). The maximum duration of the implied warranty for used consumer goods is no longer than three months following sale to a retail buyer. *Id.* at § 1795.5(c).

Mr. Parenteau and Mr. Olmedo did not begin experiencing issues until over one year after they purchased their vehicles, and Ms. Smith did not experience such issues until approximately six months after she purchased hers. However, Plaintiffs allege that their engines suffered from the defect "at the time of sale." (FAC ¶¶ 169, 171.) This allegation is bolstered by Defendant's alleged statement in its July 2012 Tech Link article that the excessive oil consumption "condition" "may not be evident until the vehicle has accumulated 20,000 miles or more." (*Id.* at ¶ 11.)

The California Court of Appeal squarely addressed this issue in *Mexia v. Rinker Boat Company, Inc.*, 174 Cal. App. 4th 1297 (2009). There, the court explained that "[t]he implied warranty of merchantability may be breached by a latent defect undiscoverable at the time of sale. . . . In the case of a latent defect, a product is rendered unmerchantable, and the warranty of merchantability is breached, by the *existence* of the unseen defect, not by its subsequent discovery." *Id.* at 1304-05 (emphasis added). The court found no support in the statute for the argument advanced by Defendant - "that latent defects must be discovered and reported to the seller within the specified time." *Id.* at 1310. In fact, such an interpretation "conflicts with the policy repeatedly expressed by the California courts of the need to construe the Song-Beverly Act so as to implement the legislative intent to *expand* consumer protection and remedies" beyond those provided in the Uniform Commercial Code ("UCC"); the UCC itself allows a reasonable time period for notification "*after the point the purchaser knew or should have know[n] of the breach*." *Id.* at 1310-11 (emphasis in original). The question of whether the defect in fact existed at the time of sale, or within the duration period, is one which must be answered at a later stage in the proceedings. *Id.* at 1308.

Under *Mexia*, Plaintiffs' plausible allegation that the defect existed at the time they purchased their vehicles is sufficient to state a claim for breach of the implied warranty of merchantability. As Defendant notes, certain district courts within the Ninth Circuit have declined to apply *Mexia*, primarily out of concern that its holding "renders meaningless any durational limits on implied warranties." *Marchante v. Sony Corp. of Am., Inc.*, 801 F. Supp. 2d 1013 (S.D. Cal. 2011); *see also Daniel v. Ford Motor Co.*, 11-02890-WBS, 2013 WL 2474934, at *7-8 (E.D. Cal. June 7, 2013). As the court in

---

[7]The FAC contains similar consumer complaints. (*See* FAC 13:23-14:5 ("On several occasions the vehicle has stalled while driving, engine shifts hard/delayed while driving . . . ."), 17:9-18:2 (vehicle "has continuously had issues when idling or at low speeds . . . . Sometimes this will cause the car to stall. This has been particularly scary on the highway . . . and on the Bay Bridge during rush hour traffic.").)

*Marchante* saw it, "[e]very defect that arises could conceivably be tied to an imperfection existing during the implied warranty period." 801 F. Supp. 2d at 1022. Yet it is the defect itself, rather than some theoretical imperfection, that must exist during the warranty period, and that defect must be so severe as to cause the product to fall below the "minimum level of quality" guaranteed by the warranty. Moreover, the court in *Mexia* considered "the burden and expense" defendants may face "in defending implied warranty claims years after the sale" of a product, but noted that addressing this concern "is unquestionably a legislative function," rather than a judicial one. *Mexia*, 174 Cal. App. 4th at 296.

*Mexia* appears to be the most recent published California Court of Appeal case to squarely address this issue, and this Court finds it to be well-reasoned. Moreover, at least one later-published decision by the California Court of Appeal has cited it with approval. *See Donlen v. Ford Motor Co.*, 217 Cal. App. 4th 138, 189 (2013) ("Indeed, that a defect first appears after a warranty has expired does *not* necessarily mean the defect did not exist when the product was purchased.") (citing *Mexia*, 174 Cal. App. 4th at 1308) (emphasis in original). The Court therefore joins other district courts in the Ninth Circuit and follows *Mexia* here. *See Ehrlich v. BMW of N. Am., LLC*, 801 F. Supp. 2d 908, 924 (C.D. Cal. 2010) ("The Court will follow *Mexia* . . . to find that Plaintiff can pursue his Song-Beverly Act claim."); *Keegan v. Am. Honda Motor Co., Inc.*, 284 F.R.D. 504, 537 (C.D. Cal. 2012) (citing *Mexia* with approval).[8]

Therefore, the Court **DENIES** Defendant's Motion to Dismiss as to Plaintiffs' sixth claim.

---

[8]At least one court in the District of New Jersey has also followed *Mexia* in applying California law, and its opinion provides an insightful assessment of that case. *See Majdipour v. Jaguar Land Rover N. Am., LLC*, 12-cv-07849-WHW, 2013 WL 5574626, at *23 (D.N.J. Oct. 9, 2013) (unpublished) ("*Mexia* is a thoroughly reasoned, published opinion by a California Court of Appeal that is less than five years old. The court took into account the statutory history, its language, and its purpose in reaching its decision. It ultimately concluded that applying the durational limits to latent defects that existed at the time of sale and manifest after those limits expire is 'unsupported by the text of the statute, legal authority, or sound policy.' . . . The skepticism of a few federal district courts concerning the wisdom of the decision are not, in this Court's view, 'persuasive data that the highest court of the state would decide otherwise.'") (quoting *Boyanowski v. Capital Area Intermediate Unit*, 215 F.3d 396, 406 (3d Cir. 2000)).

## V. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's Motion to Dismiss Plaintiff's first three claims as to Plaintiff Smith, **with leave to amend by March 20, 2015**. In all other respects, Defendant's Motion is **DENIED**.

**IT IS SO ORDERED.**

_____ : _____

**Initials of Preparer** _____